This is a suit to foreclose a mortgage on a large apartment house and the tract of land on which it is built in Cranford, Union county. The premises were sold pendente lite for $142,500 and the proceeds paid into court. Subsequently, by order made in this cause, the complainant was paid and there now remains a surplus to be disposed of, amounting to $70,347.21, besides interest accrued. There was a reference to a master, who reported encumbrances in the following order of priority:
 Mortgage of Shilowitz and Tucker .................... $23,482.00
 Mortgage of Cartaret Company ........................ 37,365.48
 Mortgage of West Bergen, Trust Co. .................. 6,874.00
 Mechanics' liens of 17 defendants ................... 74,810.74
 Mortgage of Junction Milling Co. .................... 7,973.00

Exceptions have been filed by Junction Milling Company and eight claimants. The case is before the court for final hearing on these exceptions.
I will take up the mortgages in the order of priority of record:
(1) Mortgage of Shilowitz and Tucker, dated July 29th, 1927,recorded August 2d 1927. This mortgage, like all the others, was made and recorded after the construction of the building on the premises had been commenced but before any lien claims had been filed. The mortgagees claim priority over the mechanics' lienors on the ground that the mortgage money was actually applied to the erection of the building and because the lienors or some of them by agreement *Page 409 
postponed their liens to this mortgage. The master made no express findings on these issues of fact. He merely reported that the total sum of principal and interest which he found due is a first lien on the premises described in the complaint. A master's finding of a fact in issue is entitled to great weight and should not be disturbed when there is a serious conflict of evidence.Bagley, c., Co. v. Traders, c., Co., 86 Atl. Rep. 1029. But when, as here, the master makes no finding of the fact and his conclusion may be based on an erroneous conception of the law, the court, on exceptions to the report, must decide the fact for itself in accordance with the evidence.
The principal sum advanced on the Shilowitz and Tucker mortgage was $20,000. Exceptants admit that $13,800 was applied to the construction of the building. The mortgagees admit that $1,000 was paid for legal services in connection with the loan. However necessary and proper this disbursement was, it is not money that entered into the building within the meaning of section 15 of the Mechanics' Lien act of 1898. Fischgrund v. Eriksen, c., Co.,105 N.J. Eq. 345; 145 Atl. Rep. 811. See, also, Harry Pinsky Son Co. v. Wike, 101 N.J. Eq. 45; 136 Atl. Rep. 920; LincolnMaterial Co. v. Goodwin Construction Co., 106 N.J. Eq. 326.
The remaining $5,200 is in dispute. The owner of the land constructing the building was the Capitol Construction Company, of which the president was Hyman Silverman, the secretary, Jacob Starr, and the treasurer, Harry Starr. These three men were the principal stockholders of the company. As I recall, the only other stockholders were their wives. The same three men were also co-partners, carrying on the business of carpenter contractors under the firm name of Starr Silverman. A contract for the carpenter work was executed May 25th, 1927, between the Capitol Construction Company and Starr Silverman. The entire $5,200 was paid to Starr Silverman pursuant to this contract. Furthermore, it appears, though not clearly, that this sum, besides other moneys, was used by Starr Silverman to pay the wages of journeymen carpenters on the job. The exceptants contend that this *Page 410 
contract was a mere device to permit the diversion of mortgage money to purposes other than the erection of the building and that Starr Silverman did not actually do the carpentry work. As no other contractor appears to have done it, exceptants take the position that this work was done by day labor employed directly by the owner. The burden of establishing the fraud was on the exceptants; they have not sustained their position. I find that out of the principal sum of $20,000 advanced on this mortgage, $19,000 was applied to the erection of the building and is prior to the mechanics' lien claims, and $1,000 was not so applied and is inferior except as affected by subordination agreements.
The master reported that all the mechanics' lienors — seventeen in number — are subordinate to the entire amount due on this mortgage. Of these, none but George F. Perry Sons, Incorporated, and A.S. Reid Company claim priority. The sum of these two claims is $9,262. Their counsel contend that they should receive the entire sum of $1,000 as to which they have established priority and not merely their pro rata share which they would receive if all the other lienors had established priority. I do not think this contention can prevail. These exceptants have not proved any facts peculiar to their own claims which entitle them to advancement. They have merely established a situation in which prima facie all mechanics' lien claims are advanced and should share equally. The lienors who do not claim priority over any part of the Shilowitz and Tucker mortgage, entered into agreements with the mortgagees whereby they postponed their claims. These agreements were made with and for the benefit of the mortgagees in order to induce them to advance money on the mortgage; they were not intended for the benefit of Perry or Reid. The only purpose was to protect the mortgagee in the exact situation which has arisen, namely, to secure the priority of the mortgage with respect to the money loaned but not applied to the building. If the exceptants' contention prevails, these instruments would be entirely nullified and the mortgagees in no better position than if they had not taken the precaution of securing postponement agreements. *Page 411 
They would be nullified, that is, so far as the mortgagees are concerned, but kept alive for the purpose of diverting the fund to the exceptants.
The execution of postponement agreements by the other lienors neither injures nor aids Perry and Reid. They will be allowed out of the sum of $1,000, that proportion of their claims which $1,000 bears to the amount due on the claims of all the lienors.
Perry and Reid both reduced their claims to judgment. Perry's judgment was entered January 13th, 1928, for $6,028.37; that of Reid was entered July 7th, 1928, for $3,233.90. The master reported that there was due July 29th, 1930, to Perry and to Reid the face amounts of the judgments. For some reason, he did not allow interest; this was error.
The master reported interest at six per cent. on all the mortgages, to the date of his report. Several of the exceptants urge that interest should be allowed at six per cent. only to the time of the sale pendente lite, and since then only at the rate paid by the clerk on the funds in his hands. There may be cases in which the circumstances are such that equity requires interest to be allowed only to the time of sale, but the general rule is the other way. A creditor should have interest until he is paid or until funds are made available to him, as by a decree directing the clerk to make the distribution. In the absence of special circumstances, there is no more reason why a creditor holding a prior security should be compelled to forego interest for the benefit of subordinate creditors than there is reason that he should yield up a part of his principal for their benefit. All the defendants will be allowed interest on their several debts to the date of the decree. At the oral argument, it developed that there was no dispute over the mortgage of Shilowitz and Tucker to the extent of $14,500 and Cartaret Realty Company to the extent of $15,000. Thereupon, an order was made directing the payment forthwith of these sums. Of course, when the final decree is drawn, credit should be given for these amounts and interest from the time the order was made should be calculated on the balance only. *Page 412 
(2) Mortgage of Junction Milling Company, dated September16th, 1927, recorded October 6th, 1927. At the time this mortgage was given, the firm of Starr Silverman was indebted to the milling comapny for $2,919.34 for material sold them, and used in construction work not connected with the present suit. The milling company on that date also had a contract with Capitol Construction Company to furnish trim on the Cranford job for the contract price of $8,800 and had already delivered the greater part of the material. The mortgage was given by the Capitol Construction Company to secure payment of its own debt as well as the debt of Starr Silverman. On October 27th, 1927, the mortgagee received $2,000 on account of the $8,800 item. The master has reported that there is due on this mortgage for principal and interest, $7,973. The evidence seems to indicate a large amount due, but as no exception has been taken on this ground, I accept $7,973 as correct.
The taking of this mortgage waived the right to a mechanics' lien. Weaver v. Demuth, 40 N.J. Law 238. Nevertheless, the milling company on March 9th, 1928, filed a lien claim for $8,625, part of the amount due on the mortgage. At the hearing before the master, it abandoned its lien claim. In my opinion, the filing and abandonment of the lien claim do not affect, in any respect, the rights of the milling company under its mortgage.
This mortgage, so far as it secures the debt of Starr 
Silverman, is, of course, deferred to mechanics' lien claims. I think the balance due on the mortgage is likewise deferred by section 28 of the Mechanics' Lien law. The only basis for a contrary view is the provision in section 15, giving a mortgage preference "to the extent of the money actually advanced and paid by the mortgagee and applied to the erection of any new building upon the mortgaged lands." The act divides into two classes those who lend credit to aid in the erection of a building, namely, those who advance funds and those who perform labor or furnish material. In the statutory scheme, the first class are secured by mortgage and the latter by lien claims. In my opinion, the phrase "money actually advanced *Page 413 
and paid" does not include building materials furnished. One materialman cannot secure priority over others, after the commencement of the building, by taking a mortgage. This conclusion is in harmony with the decision of Vice-Chancellor Berry in Meister v. J. Meister, Inc., 103 N.J. Eq. 78.
The master has reported that this mortgage is subordinate to the mortgages of the Cartaret Company and West Bergen Trust Company which were executed after the milling company's mortgage was recorded. No reason for this postponement is stated in the report or has been suggested by counsel. I therefore sustain the exceptions of the milling company in this respect.
The milling company mortgage covers only a part of the tract described in all the other mortgages both prior and subsequent. The premises were sold in this cause as a whole and not in parcels. But the undisputed evidence of experts is that the part of the entire tract covered by the milling company mortgage is in value eight per cent. of the whole. If, from the fund still in court, $70,347.21, there be deducted the amount due on the Shilowitz and Tucker mortgage, $23,482 and costs, there will remain about $43,750 of which eight per cent. is $3,500 or only half the sum due on the Junction Milling Company mortgage. But the whole amount received by the sheriff, $142,500, may be considered as two funds — eight per cent. of it, $11,400, as the proceeds of the tract covered by the milling company mortgage and $131,100, the proceeds of the balance of the tract. These two funds should be marshalled, and the prior mortgages and costs which are a lien on both funds should be charged against the greater one so as to leave enough in the smaller fund on which alone the milling company mortgage is a lien, to permit the payment of the amount due on that mortgage in full. This, of course, will reduce the amount available for the payment of subordinate mortgages. But these mortgagees cannot complain since they took their mortgages with notice of the mortgage of the Junction Milling Company.
(3) Mortgage of Cartaret Company, dated October 14th, 1927,recorded October 24th, 1927. The same questions *Page 414 
arise in respect to this mortgage as have already been considered with regard to the mortgage of Shilowitz and Tucker. The principal sum secured is $35,000. $29,955.70 undeniably went into the building. $2,744.30 was used to pay lawyers' fees and insurance premiums and is subordinate to mechanics' lienors. $2,300 is in dispute and was paid to Starr Silverman. I find that it, too, was applied to the erection of the building. So that $32,255.70 is prior to the mechanics' lien claimants. Here, too, all of the claimants except Perry, but including Reid, postponed their claims to this mortgage. Perry will be allowed his proportionate part of $2,744.30 and interest out of the fund which would otherwise go to the Cartaret Company.
(4) Mortgage of West Bergen Trust Company, dated October 25th,1927, recorded October 26th, 1927. Besides Perry and Reid, six other mechanics' lien claimants by exceptions assert priority over the whole amount due on this mortgage. Since prior payments out of the fund in court will leave less than $2,000 to be applied on this mortgage, it is necessary to consider only so much of the amount due thereon.
The Capitol Construction Company had a checking account with the trust company. On Saturday, September 10th, 1927, the balance in this account was $651.53, but there was outstanding a check which was presented that day for $2,000 for plaster work on the apartment house. At about noon, the Starrs and Silverman called on one of the officers of the bank and obtained credit for the construction company for $5,000, and drew its note in that amount payable in one month. The check was thereupon paid by the bank. The fact that the note was not credited to the account until the following Monday is immaterial, since the granting of the credit and the delivery of the note preceded the payment of the check. On September 13th, and before any other deposits were made to this account, $1,000 was checked out to McCabe Brothers for excavating at this job. On October 25th the mortgage in question was executed to secure payment of the amount due the trust company.
The exceptants say that the loan was made on the general *Page 415 
credit of the construction company and no money was actually advanced on the faith of the mortgage, and therefore the mortgage is not preferred. The contrary rule is established by Young v.Haight, 69 N.J. Law 453; 55 Atl. Rep. 100. A mortgagee who lends money to the owner on the owner's general credit and thereafter takes a mortgage to secure the debt, is preferred by section 15 of the Mechanics' Lien act over mechanics' lien claimants, provided the money advanced was actually applied to the building.
Exceptants also point out that the $5,000 loaned was mingled with other funds of the construction company and therefore, they say, the court cannot know with certainty that the money loaned was applied to the building. This is not accurate. In order to obviate the difficulty created by the mingling of funds, I will assume that $651.53 out of $3,000 applied to the building consumed the balance on hand September 10th. Then necessarily the remaining $2,348.47 applied to the building was made out of the money loaned by the trust company.
To this extent, the trust company is preferred to all the lien claimants except Perry.
As noted above, Perry took judgment in the circuit court, establishing his lien. The West Bergen Trust Company was a party to this action; the judgment established that the lien claim was paramount to the mortgage. This judgment cannot be controverted in the present suit unless there are special circumstances.Peoples Building and Loan v. Vaniewsky, 85 N.J. Eq. 551;96 Atl. Rep. 1074. The judgment was entered by default. Prior to the entry of the judgment, the Capitol Construction Company had been adjudged insolvent. The trust company apparently assumed that the action in the circuit could would not be pressed since a receiver had been appointed and therefore interposed no defense. I do not think it inequitable to give to this judgment its ordinary effect. If the trust company desired to avoid it, it should have applied to the circuit court to vacate the judgment. I therefore find that Perry's lien claim is preferred to the mortgage of the West Bergen Trust Company, and must be *Page 416 
paid out of the funds that would otherwise go to that company. The situation is different from that already discussed in respect to the mortgages of Shilowitz and Tucker and the Cartaret Company. Perry takes only his proportion of the fund allocated to those mortgages which he would get if all the other lien claimants shared pro rata; those mortgages (in part) are subordinate to lien claimants as a class. But the mortgage of the West Bergen Trust Company is preferred to lien claimants as a class and is subordinate to Perry only because of Perry's judgment. Perry will therefore receive, to the extent that the fund is available, the full amount of his judgment.
The exceptions of Junction Milling Company, Max Platt and Mowre Lager question the curtilege which may properly be covered by the lien claimants. The tract of land on which the apartment house was erected fronts on Riverside Drive and is bounded on one side by Prospect avenue and on the other by Union avenue. The distance between these two streets is about four hundred feet. The average depth of the lot is three hundred feet, so that it contains two and three-quarters acres more or less. The apartment house is a large structure with an extreme frontage of one hundred and ninety-five feet and a depth of one hundred feet. It is forty feet from Riverside Drive and midway between the side streets. On September 8th, 1927, surveyors ran lines that divided the tract into three parts. One lot, fronting on Prospect avenue, is three hundred and fifty-eight feet by ninety-four feet; another on Union avenue, two hundred and forty feet by one hundred and ten feet; and the third, the central lot on which the apartment house stands, with an average depth of three hundred feet and a width of two hundred feet. The line of one side lot was drawn within seven and twenty-five hundredths feet of the building and the line of the other side lot ten feet from the building. The mortgage of the Junction Milling Company covers the two side lots and not the central part of the tract on which is the apartment house. The survey was probably made for the purpose of this mortgage. The same description was used in *Page 417 
subsequent mortgages, namely, those of the Cartaret Company and West Bergen Trust Company. In each of these, however, all three lots are described. In the prior mortgages (and there were several besides those already mentioned) the entire premises are described as one parcel. All of the mechanics' lien claims, except those of Platt and Lager, likewise contain a description of the entire tract. The Lager and Platt claims describe only the centre lot. The three exceptants urge that all the other lien claimants are excluded from any share in the fund because the curtilage described in their claims is incorrect and excessive. The pertinent sections of the statute follow:
"1. Every building hereafter erected or built within this state shall be liable for the payment of any debt contracted and owing to any person for labor performed or materials furnished for the erection and construction thereof, which debt shall be a lien on such building, and on the land whereon it stands, including the lot or curtilage whereon the same is erected.
"21. When the curtilage or lot on which the building is erected shall not be surrounded by an enclosure separating it from adjoining lands of the same owner, then the lot on which the building lien shall extend shall be such tract as in the place of its location is usually known and designated as a building lot, and bounded by the lines laid down for its boundaries on any map made for the sale of it or on file in any public office, to lay out in lots the tract including it, and in cases where no such map exists, such lot may be designated by the claimant in the lien claim, but in no case shall the same exceed half an acre, or include any building not used and occupied with, or intended to be used and occupied with, the building for the cost of which the lien is claimed." P.L. 1898 p. 538.
Exceptants rely on the clause "but in no case shall the same exceed half an acre." The building in question, without any surrounding land at all, has an area of one-quarter acre. If there be included with it a lot extending from the street to the rear line of the building and with a width equal to the frontage of the building, over half an acre is included. The curtilage described in the claims of Platt and Lager contain an acre and a quarter of ground. They certainly are in no position to press this particular objection. Exceptants also point to the provision that "the lot on which the building lien shall extend shall be such tract as in the *Page 418 
place of its location is usually known and designated as a building lot and bounded by the lines laid down for its boundaries on any map made for the sale of it or on file in any public office, to lay out in lots the tract including it." The map made from the survey of September 8th, 1927, is said to have been filed with the building department of Cranford. At what time and for what purpose does not appear. None of the three plots shown on the map has been proved to be such a tract as in Cranford is usually known as a building lot.
In Gerard v. Birch, 28 N.J. Eq. 317, Chancellor Runyon held that a lot five hundred feet front by four hundred and fifty feet deep was a proper curtilage. The owner apparently held adjoining property as well and had caused a map to be made on which this plot was designated as lot number 21. The chancellor found that the one-half acre limitation applied only "to the case where there has been no description of the curtilage by the owner and where the means of designation by map do not exist. In such case, the lien claimant is to designate the curtilage and the limitation applies." James v. VanHorn, 39 N.J. Law 353, was an appeal from the circuit court. Judgment establishing the lien on a tract of fifty acres was affirmed. Mr. Justice Reed said: "Where there is no separation of the lot upon which the building stands from adjoining lands of the same owner, then if the land is mapped for building lots, the curtilage shall include the building lot so mapped upon which the building is erected, and if not mapped, the curtilage shall not exceed half an acre."
Vice-Chancellor Howell considered this section in FederalTrust Co. v. Guigues, 76 N.J. Eq. 495; 74 Atl. Rep. 652. The owner had erected a mansion house on a large plot, bounded by streets on three sides. The size of this plot is not stated in the opinion, but it must have been well over half an acre. A one-half acre plot is only one hundred and forty-seven feet square. Mr. Guigues also owned another lot opposite the one on which his house was built. The court held that section 21 of the Mechanics' Lien act did not apply *Page 419 
and that the curtilage subject to the liens "should be so much land as might be necessary for the convenient and beneficial enjoyment of the building on which the claimant's work was done." He limited the lien claims to the mansion house lot.
Section 21 applies only when the same owner has other lands adjoining the curtilage on which the building is erected. Whether the entire lot between Prospect avenue and Union avenue is the curtilage or whether part of it constitutes the curtilage and the balance is adjoining land of the same owner, is a question for this court to determine. The whole tract was treated by the owner as one parcel until the Junction Milling Company demanded a mortgage on the side pieces. This was several months after the erection of the building had commenced. Up to the time of the sale of the property in this suit, there were no fences or other physical signs of a division of the tract. During construction work, it was all used indiscriminately for the handling of material. The whole adds to the convenient and beneficial use of the apartment house and doubtless enables higher rentals to be had than could otherwise be obtained. I find that the entire tract is the curtilage subject to the liens describing it.
The lien claims of Max Platt and Mowre Lager describe only the central part of the lot. This does not, however, invalidate them. No bad faith is shown and no reason appears why these claimants should not be allowed their lien on the curtilages described in their claims. The only fund, however, available for the lien claimants (other than Perry and Reid) is that carved out of the mortgage of the Junction Milling Company. Platt and Lager do not claim a lien on any land covered by that mortgage. These claimants, therefore, cannot share in the moneys distributed in this cause.
Perry and Reid each filed an exception reading as follows: "Said master has erroneously failed to report that the defendants, Max Platt (and others named in the exception), had no lien or encumbrance against the mortgaged premises and are entitled to be paid nothing from the moneys deposited with the clerk of the court in this cause." An exception should *Page 420 
be so drawn as to direct the attention of the court to the exact error complained of, so that the court may readily determine the merits of the exception. The exception quoted above is too general and might properly be disregarded. However, I have considered the reasons stated in the briefs in support of the exception. As to some of the lienors, exceptants contend the evidence was insufficient to show that the claims were filed within four months after the last work was done or material furnished by the lienors or was insufficient to establish the exact amounts due the claimants. I think the evidence sufficiently supports the master's findings. It is also objected that a number of these claimants did not bring suit in the circuit court within four months or failed to prosecute the same diligently within one year as required by section 18 of the statute. But it also appears that the Capitol Construction Company, the owner of the premises, was adjudged insolvent by this court and receivers appointed before the expiration of the four-month period or the one-year period. The appointment of the receivers relieved the claimants from the necessity of bringing suit on their lien claims until the receivers or the court of chancery should require suit to be brought. Likewise, if action had been started before the appointment of the receivers, the diligent prosecution of that action became unnecessary after the appointment. All controversies concerning the indebtedness of the insolvent company and the liens upon its property may be disposed of by the court in the insolvency proceeding. Ennis v. EdenMills Paper Co., 65 N.J. Law 577; 48 Atl. Rep. 610; Doty v.Auditorium Pier Co., 56 Atl. Rep. 720; affirmed, 65 N.J. Eq. 768; 56 Atl. Rep. 1132; Meister v. J. Meister, Inc., 103 N.J. Eq. 78.
It is similarly objected that the validity of the lien and the amount due thereon, if not established by judgment of the circuit court, must be adjudicated by the receiver in the insolvency proceeding and that this court should not, in a foreclosure suit, attempt to decide these questions. This contention requires but little attention. It is everyday practice for this court in foreclosure to establish and enforce mechanics' *Page 421 
liens which have been neither reduced to judgment nor allowed by a receiver.
The master reported that there was due on the mechanics' liens $74,810.74, including interest to the date of his report, July 29th, 1930. To that sum should be added interest on the Reid and Perry judgments, making the total $76,133.
In respect to costs and counsel fee, I have considered that the defendants Shilowitz and Tucker and Cartaret Company have been substantially successful and should have their costs, including counsel fees such as are usually allowed in contested foreclosure cases. The Junction Milling Company and the West Bergen Trust Company receive nothing in this suit and cannot be allowed costs out of the fund. Counsel for Perry and Reid have borne the brunt of the battle for the lien claimants and have succeeded in securing a part of the fund for these claimants. They will, therefore, be allowed counsel fees out of that part of the fund which is distributed to the lien claimants. The lien claimants will not be allowed costs since the moneys available are insufficient to pay their claims in full.
The marshalling of the entire fund in court is determined byHoag v. Sayre, 33 N.J. Eq. 552; Albert Kernahan v.Franklin Arms, 104 N.J. Eq. 446; Thirteenth Ward Building andLoan Assn. v. Kanter, 105 N.J. Eq. 339. The fund should be distributed as set forth in the table below. In that table, interest is calculated only to the date of the master's report. It should, however, be calculated to the date of the decree; counsel, in drafting the decree, will change the figures accordingly.
 DISTRIBUTION OF FUND.
To Shilowitz and Tucker, costs including a counsel fee of
 $300.
To Shilowitz and Tucker .................................. $22,307.90
To Perry 6950/76133rds of $1,174.10 ...................... 107.19
To Reid 3632/76133rds of $1,174.10 ....................... 56.00
To Shilowitz and Tucker, balance of $1,174.10 ............ 1,010.91
 ___________
 $23,482.00
 *Page 422 
To Perry, a counsel fee of ............................... $200.00
To Reid, a counsel fee of ................................ 200.00
To each lien claimant except Platt and Lager, his pro
 rata share of ..................................... 7,773.00
 ___________
 $7,973.00
To Carteret Company, costs, including counsel fee of $300.
To Carteret Company ...................................... $34,435.66
To Perry 6950/76133rds of $2,929.82 ...................... 267.49
To Carteret Co., balance of $2,929.82 .................... 2,662.33
 ----------
 $37,365.48
To Perry, the balance in the clerk's hands.